IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PENSION BENEFIT GUARANTY          :          CIVIL ACTION
CORPORATION                       :
                                  :
          v.                      :
                                  :
SAINT-GOBAIN CORPORATION          :
BENEFITS COMMITTEE, et al.        :          NO. 13-2069


MEMORANDUM

McLaughlin, J.                                October 4, 2013


This case involves an application to the Court by the

Pension Benefit Guaranty Corporation ("PBGC") for a decree

adjudicating that the Saint-Gobain Containers, Inc. Retirement

Income Plan (the "Pension Plan"), administered by the Saint-

Gobain Corporation Benefits Committee (the "Benefits

Committee"), must be terminated.  After receiving notice from

PBGC of its intent to initiate proceedings to terminate the

plan, the Benefits Committee did not consent to termination.

PBGC therefore applied to this Court seeking termination of the

Pension Plan.

Before the Court are cross-motions for summary

judgment on the issue of whether the Court should determine de

novo whether to issue a decree terminating the Pension Plan.

The Benefits Committee argues that 29 U.S.C. § 1342(c) directs

the Court to make a de novo determination whether the Pension

Plan must be terminated.  Intervener defendants Ardagh Group
S.A. ("Ardagh"), Glass, Molders, Pottery, Plastics and Allied
Workers International Union ("GMP"), and United Steel, Paper and
Forestry, Rubber, Manufacturing, Energy, Allied Industrial and
Service Workers International Union ("USW")(collectively
"Unions") have joined in the Benefits Committee's motion.

PBGC asserts that its decision to initiate proceedings
to terminate the Pension Plan falls within an "informal
adjudication" under the Administrative Procedure Act ("APA").
As such, PBGC argues that the Court must review its
determination under the "arbitrary and capricious standard," and
must look only to the administrative record in making that
decision.

According to the Benefits Committee, PBGC's
determination is not "agency action" that requires judicial
review under the APA.  The Benefits Committee urges the Court to
adopt the Seventh Circuit's analysis in In re UAL Corp., 468
F.3d 444 (7th Cir. 2006), and make its own determination as to
whether the Pension Plan should be terminated.  In making its
decision, the Benefits Committee argues, the Court is not
limited to review of the administrative record.

The Court agrees with the Benefits Committee and
concludes that § 1342(c) directs the Court to decide whether the
pension plan should be terminated in the first instance.  The

Court finds that PBGC's decision to initiate termination proceedings is not an "agency action" for which PBGC seeks "review," and therefore the "arbitrary and capricious" standard of review under the APA does not apply. The Court will therefore grant the Benefits Committee's motion for partial summary judgment.

I.   Allegations in the Complaint

        The plaintiff in this suit is the Pension Benefit Guaranty Corporation ("PBGC"), a corporation that is wholly owned by the U.S. government. PBGC is statutorily authorized to administer the pension plan termination insurance program created under Title IV of the Employee Retirement Income Security Act ("ERISA"). PBGC has the power to commence proceedings to terminate a pension plan whenever it determines that "the possible long-run loss of [PBGC] with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated." 29 U.S.C. § 1342(a)(4). When an underfunded pension plan terminates, PBGC ensures the timely and uninterrupted payment of pension benefits to plan participants and their beneficiaries. Compl. ¶ 3; 29 U.S.C. §§ 1302(a)(2), 1321, 1322.

        Saint-Gobain Containers, Inc, also known as Verallia North America, ("Containers") is a subsidiary of the French

company Compagnie de Saint-Gobain ("Saint-Gobain").  Containers is the sponsor of a pension plan for 12,745 participating current and former employees.  The Pension Plan is administered by the Benefits Committee.  PBGC estimates that the Pension Plan is currently underfunded by $523.7 million.  The Pension Plan is a single-employer defined benefit pension plan that is covered under Title IV of ERISA.  Id. ¶¶ 4-7.

On January 17, 2013, Saint-Gobain entered into an agreement for the sale of Containers to Ardagh.  Ardagh is a glass and metal packaging company located in Luxembourg.  PBGC has determined that the sale to Ardagh will unreasonably increase the possible long-run loss to PBGC with respect to the Pension Plan.  Id. ¶¶ 9-10.

In accordance with the statute, PBGC issued a Notice of Determination to the Benefits Committee, notifying it of the PBGC's intent to initiate proceedings to terminate the plan.  PBGC also published notice in USA Today on April 18, 2013, advising Pension Plan participants of the PBGC's intent.  Id. ¶¶ 11-12.

Because the Benefits Committee did not consent to termination, PBGC brought this action under 29 U.S.C. § 1342(c) seeking that the Court (1) adjudicate the Pension Plan terminated, (2) appoint PBGC as trustee for the Pension Plan,

and (3) establish April 18, 2013 as the termination date of the Pension Plan.  Id. ¶¶ 13-19.


II.  PBGC's Statutory Authority under Title IV of ERISA

Title IV of ERISA established the PBGC to administer a program for termination of defined benefit pension plans.  The purposes of the program are (1) to encourage the continuation and maintenance of private pension plans, (2) to provide for timely and uninterrupted payment of benefits, and (3) to maintain premiums for plan terminations at the lowest level possible consistent with PBGC obligations.  29 U.S.C. § 1302(a).

Terminations of pension plans are governed by ERISA §§ 4041-4042, 29 U.S.C. §§ 1341-1342.  There are two types of terminations: voluntary and involuntary.  A voluntary termination can be categorized as either a "standard termination" or a "distress termination."  29 U.S.C. § 1341(a)(1).  A standard termination occurs when the pension plan has sufficient assets to pay all of its benefit obligations.  29 U.S.C. § 1341(b).  A distress termination occurs when the employer seeks to terminate a plan that has insufficient assets to pay its benefit obligations.  29 U.S.C. § 1341(c); See also Pension Ben. Guar. Corp. v. LTV Corp., 496 U.S. 633, 638-39 (1990).

The ERISA section that governs involuntary terminations is entitled "Institution of termination proceedings by the corporation."  29 U.S.C. § 1342.  Subsection (a), "Authority to institute proceedings to terminate a plan," provides that "[t]he corporation may institute proceedings under this section to terminate a plan whenever it determines that" (1) the plan has not met minimum funding standards, (2) "the plan will be unable to pay benefits when due," (3) there has been a large distribution under the plan to a participant who is also a substantial owner, which has caused some vested benefits to become unfunded, or (4) "the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated."  29 U.S.C. § 1342(a).

If PBGC determines that one of those conditions is met, after giving notice to the plan administrator, it may:

> apply to the appropriate United States district court for a decree adjudicating that the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund.

29 U.S.C. § 1342(c)(1).

The statute also provides that, when PBGC determines that one of the above conditions has been met, it may, upon notice, apply to the district court for the appointment of a

trustee to administer the plan.  29 U.S.C. § 1342(b)(1).  PBGC may request that it be appointed as the trustee.  <u>Id.</u>  If a trustee has been appointed and that trustee "disagrees with the determination of [PBGC] . . . he may intervene in the proceeding relating to the application for the decree, or make application for such decree himself."  <u>Id.</u>  After the court appoints a trustee and enters a decree adjudicating the plan terminated, the court is to authorize the trustee to terminate the plan.  29 U.S.C. § 1342(c)(1).

Finally, absent an agreement between the plan administrator and PBGC, the court establishes a date on which the pension plan is to be considered terminated.  29 U.S.C. § 1348(a)(4).

## III. <u>Discussion</u>

PBGC argues that it has made the determination that the Pension Plan should be terminated, and that the Court should defer to its judgment according to the "arbitrary and capricious" standard of the Administrative Procedures Act.  The defendants argue that PBGC has not taken "agency action" that would entitle PBGC to review under the APA.  The Court must therefore decide whether review under the APA applies to the circumstances of this case.  The Court concludes that it does not.

The APA establishes a system of judicial review of administrative agency decisions that qualify as either "agency action made reviewable by statute" or "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Here, PBGC argues that its determinations under § 1342 are "final agency actions within the meaning of the APA." PBGC Opp'n 8.

An "agency action" is defined by the APA as "the whole or part[1] of an agency rule, order,[2] license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The term "agency action" includes "the supporting procedures, findings, conclusions, or statements of reasons or basis for the action or inaction." H.R. Rep. No. 1980-79 at 255 (1946). "Generally, an agency must do something that is binding on the parties before agency action will be found." Jacob A. Stein et al., <u>Administrative Law</u> § 43.01 (2012).

Agency action is divided into rulemaking and adjudication. <u>See</u> 5 U.S.C. §§ 553, 554. Adjudication is

---

[1] "'[W]hole or part' refers to components of that which is itself the final disposition required by the definition of 'order.'" <u>Int'l Tel. & Tel. Corp., Comm. Equip. Sys. Div. v. Local 134, IBEW</u>, 419 U.S. 428, 443 (1975).

[2] "Order" is defined as "the whole or part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). An "order" is formulated by an agency through an "adjudication." 5 U.S.C. § 551(7).

further divided into "informal adjudication" and "formal adjudication." Formal adjudication involves formal procedures such as an administrative hearing. 5 U.S.C. § 554. There are no formality requirements for an "informal adjudication." See LTV Corp., 296 U.S. at 654 (1990).

No one argues that PBGC has exercised rulemaking authority here. In this case, PBGC argues that its decision to institute the current proceeding was the end result of an informal adjudication. The defendants argue that PBGC has not taken agency action that would warrant review under the APA. The Court agrees with the defendants. PBGC's process for determining whether to institute proceedings to terminate a pension plan does not qualify as an adjudication, and the statute under which PBGC brings this action does not direct the Court to "review" the agency's decision according to the APA.

PBGC asserts that it follows an "established administrative process" to decide whether the conditions are met to initiate proceedings to terminate a pension plan. In that process, a group of PBGC analysts called the "Trusteeship Working Group" ("TWG") first reviews a recommendation by other PBGC staff that one of the conditions of 29 U.S.C. § 1342(a) has been satisfied. The TWG then makes a recommendation to the "approving official," which in this case would have been the PBGC Director. The Director reviews the recommendation and

supporting documents and decides whether the pension plan should be terminated, and whether PBGC should be appointed as trustee. The Director also determines a date on which the plan should be terminated. Finally, the Director's decision is documented in the Notice of Determination, which is sent to the plan administrator. PBGC Opp'n 4-5.

This process is laid out in PBGC's Directive Number TR 00-2 ("Directive"). The Directive characterizes this process as the "PBGC's initiation of the termination and trusteeship of a single-employer pension plan." Am'd Trasm'l Decl. of Elizabeth B. Fry, Directive 4. In explaining the procedure, the Directive consistently refers to PBGC's authority to "initiate termination proceedings." Id. at 5. The end result of PBGC's procedure is the Notice of Determination that is sent to the plan administrator. Typically, upon receipt and evaluation, the plan administrator consents to termination. If the plan administrator does not agree, as the Benefits Committee did not agree here, then PBGC must initiate proceedings in the district court in order to effectuate termination of the plan. See 29 U.S.C. § 1342(c).

Typically, an agency "adjudication" results in an order, sanction, license, rule, or denial thereof. 5 U.S.C. § 551(13). PBGC's brief defines "adjudication" as an "agency process for formulation of an order," and an "order is an

agency's final disposition in a matter other than rulemaking."
PBGC Opp'n 7.

Although PBGC has chosen to characterize its review
procedure as an "informal adjudication," the process does not
result in a decision or order that has any legally binding
effect whatsoever. The result of its procedure, rather, is to
notify the plan administrator of its intent to initiate
proceedings to terminate the plan. The plan administrator faces
no legal consequences for refusing to agree to terminate the
plan, except that it may face litigation of the issue in court.

The Supreme Court has explained that an adjudication
is an "agency process for the formulation of an order," and that
an "order" must have "some determinate consequences for the
party to the proceeding." Int'l Tel. & Tel. Corp., Comm. Equip.
Sys. Div. v. Local 134, IBEW, 419 U.S. 428, 443 (1975)(quoting 5
U.S.C. § 551(6), (7)). The Supreme Court noted a passage from
the Attorney General's Manual on the APA, which explained that
"investigatory proceedings, no matter how formal, which do not
lead to the issuance of an order containing the element of final
disposition as required by the definition, do not constitute
adjudication." Id. "[D]etermination of whether an agency
action qualifies as a "final order" depends on the consequences
of the action, such as whether the action "imposes an

obligation" or "denies a right.[3]  Shea v. Office of Thrift
Supervision, 934 F.2d 41, 45 (3d Cir. 1991).

PBGC argues that it has made the determination that
the Pension Plan should be terminated, and that determination is
final agency action because there is no internal appeal or
possibility for reconsideration of the decision.  Although it
may be true that the notice is PBGC's last internal step toward
termination, it is not the final disposition of the issue.  PBGC
is still required to apply to the district court in order for
the decision to have any legal or binding effect.  The only
consequence of PBGC's determination is that the plan
administrator faces litigation.[4]

---

[3] See also FTC v. Standard Oil Co., 449 U.S. 232, 241-242
(1980) (FTC's averment of a "reason to believe" that a law has
been violated is not definitive and is merely a determination
that adjudicatory proceedings will commence); ITT Corp., 419
U.S. at 443-444 (NLRB investigatory proceeding was not an
adjudication because the resulting determination, "standing
alone, binds no one"); Hannah v. Larche, 363 U.S. 420, 441
(1960) (finding that the Commission on Civil Rights does not
adjudicate because it can only engage in factfinding that will
be used in subsequent proceedings, and "cannot take any
affirmative action which will affect an individual's legal
rights").

[4] See Atl. Richfield Co. v. U.S. Dep't of Energy, 769 F.2d
771, 787 (D.C. Cir. 1984)("An agency's decision after an
investigation to bring suit, or after a finding of probable
cause to issue a complaint, is merely preparatory to some
further proceeding. Such decisions may utilize adjudicatory-type
procedures, but they determine the legal rights and liabilities
of no one; rather, they require subsequent affirmative action,
often by a third party before an independent tribunal, before
they acquire any legal efficacy.").

12

Additionally, this court action brought by PBGC is not like other proceedings to review an administrative action under the APA. Typically, judicial review of agency action under the terms of the APA occurs in two ways: (1) an aggrieved party seeks to have a court set aside the agency action, or (2) the agency files an enforcement action in court after the affected party refuses to comply with the agency order. This case does not fall into either of those categories. PBGC has not cited any other statutes or agency decisions that call for application to the district court for a decree as does § 1342(c) and that would be reviewed under the APA.

Here, the Court is not asked to "review" an agency adjudication and is not asked to "set aside" an agency determination. Rather, the statute directs PBGC to apply to the district court for a decree adjudicating that the plan must be terminated. This indicates that the district court is to make the determination of whether the plan must be terminated de novo. The language of the statute does not suggest that the court should "review" PBGC's determination under the APA.

If Congress meant for such a determination to be reviewed under the "arbitrary and capricious" standard, it could have given PBGC the powers to order that the plan be terminated without assistance from the court, as it has in other sections, and then allow for "review" or "enforcement" of that decision

under the APA.  The statute, however, sets an involuntary termination apart, and requires PBGC to apply to the district court in order to "adjudicate" that the plan should be terminated.

PBGC argues that the Court must apply the "arbitrary and capricious" standard, however, because other courts including the Supreme Court have determined in that PBGC decisions and entitled to such deference.  In Pension Benefit Guaranty Corp. v. LTV Corp., et al., 496 U.S. 633 (1990), a pension plan was terminated pursuant to a consent decree between the plan administrator and PBGC.[5]  Later, PBGC determined that the factors that necessitated termination of the plan had changed significantly.  PBGC therefore determined that the pension plan should be restored pursuant to 29 U.S.C. § 1347. Id. at 638-643.

Under § 1347, when PBGC determines that a plan that has been or is being terminated should not actually be terminated, PBGC "is authorized to cease any activities undertaken to terminate the plan, and to take whatever action is necessary and within its power to restore the plan to its status prior to the determination that the plan was to be terminated. . . ."  29 U.S.C. § 1347.

---

[5] Such a termination by consent does not require court adjudication.  See Jones & Laughlin Hourly Pen. Plan v. LTV Corp., 824 F.2d 197, 200 (2d Cir. 1987).

PBGC issued a notice of restoration, and LTV refused to comply with the restoration decision.  LTV Corp., 496 U.S. at 645-33.  PBGC initiated an enforcement action in the district court.  Id. at 644.  The district court held that PBGC had exceeded its authority.  Id.  The Second Circuit affirmed, holding that PBGC's restoration decision was arbitrary and capricious.  Id.  The Supreme Court disagreed, and held that PBGC's restoration decision was not arbitrary and capricious. Id. at 646.

PBGC argues that the decision illustrates the Supreme Court's intent to apply the "arbitrary and capricious" standard of review to PBGC decisions.  PBGC argues that LTV Corp. applies to § 1342, because PBGC must similarly "apply to the district court to enforce its determinations under § 1347."  PBGC Opp'n 13.  But the statute governing restoration of pension plans does not direct PBGC to "apply to the district court" as it does in § 1342 in order to effectuate its determinations.  Instead, § 1347 gives PBGC the authority to take any action necessary to restore the plan, including the authority to "transfer to the employer or a plan administrator . . . control of part or all of the remaining assets and liabilities of the plan."  29 U.S.C. §

1347.  PBGC cannot take such unilateral action to terminate a

plan under § 1342(c).[6]

The fact that PBGC must initiate an action in court to

enforce a PBGC order against a party who refuses to comply is a

different situation.  Agencies often seek judicial enforcement

of their orders against those who refuse to comply.  However, in

those proceedings, the orders at issue typically have their own

binding effect.  The noncompliant party also has often had an

opportunity to be heard through agency adjudicatory hearings.

LTV Corp., therefore, is not instructive as to whether the

"arbitrary and capricious" standard applies to this case.

The Seventh Circuit also found that LTV Corp. was not

dispositive on this issue, and held that a district court should

decide de novo whether a pension plan should be terminated under

§ 1342(c).  See In re UAL Corp., 468 F.3d 444 (7th Cir. 2006).

This Court agrees with the Seventh Circuit's reasoning.

In UAL Corp., the Seventh Circuit found that PBGC did

not use rulemaking or adjudication in its determination that a

---

[6] In describing involuntary termination, the Supreme Court
in LTV Corp. stated that PBGC "may terminate a plan
'involuntarily' . . ." when it finds that one of the four
statutory conditions is met.  LTV Corp., 496 U.S. at 639.
Although this could be read to indicate the Supreme Court's
understanding the PBGC does have authority to involuntarily
terminate a plan the same way that it has authority to restore a
plan, the Court was not addressing that issue and the language
is not instructive as to which standard of review to apply in
this case.

pension plan should be terminated.  _Id._ at 449.  Because PBGC

did not have the unilateral power to terminate the plan, its

decision to seek termination did not require deference by the

courts.  _Id._  The Court instead found that "[t]he only authority

that PBGC has under § 1342 is to ask a court for relief."  _Id._

The Court saw nothing in § 1342(c) which suggested that the

court should defer to the PBGC's determination, and thus the

PBGC was in the position of an ordinary litigant.  _Id._  at 450.

　　　　The Court distinguished an involuntary termination

under § 1342(c) from a restoration of a pension plan under §

1347, which was addressed by the Supreme Court in _LTV Corp._.

_Id._  Unlike an involuntary termination, PBGC has unilateral

authority to restore a terminated plan.  According to the

Seventh Circuit, that unilateral restoration by PBGC can

therefore be reviewed by a district court under the APA's

arbitrary and capricious standard.  _Id._  The Court concluded

that because PBGC does not have unilateral authority to

terminate a pension plan without the plan administrator's

consent or court order, such a decision to terminate is reviewed

de novo.  _Id._

　　　　The Seventh Circuit's decision is in accord with this

Court's analysis of § 1342, the APA, and the Supreme Court's

decision in _LTV Corp._.  The Court, therefore, agrees with the

Seventh Circuit and concludes that the Court should decide de

17

novo whether a pension plan should be terminated.  Although a
few district courts confronting this issue have applied the
"arbitrary and capricious" standard of review,[7] the Court is not
persuaded by those decisions.

The Court's conclusion is further supported by
language in two Third Circuit opinions regarding the termination
of pension plans by PBGC.  Although the Third Circuit has not
addressed the issue before this Court, the parties rely on these
Third Circuit cases in support of their arguments.

The most instructive Third Circuit decision was
related to the establishment of a termination date under §
1348(b)(2).  In Pension Ben. Guar. Corp. v. Heppenstall Co a
pension plan administrator informed PBGC that the pension plan
needed to be terminated.  633 F.2d 293, 298 (3d Cir. 1980).
Because of a collective bargaining agreement, the administrator
could not voluntarily terminate the plan.  Id.  Thus, the
administrator requested that PBGC seek involuntary termination.
Id.  After exploring other options and concluding that the plan
did need to be terminated, PBGC filed a complaint with the

---

[7] See In re Pan Am. World Airways, Inc. Coop. Ret. Inc.
Plan, 777 F. Supp. 1179, 1181-82 (S.D.N.Y. 1991), aff'd, Pension
Ben. v. Pension Comm., 970 F.2d 896 (2d Cir. 1992); Pension Ben.
Guar. Corp. v. Rep. Tech. Int'l, LLC, 211 F.R.D. 307 (N.D. Ohio
2002); Pension Ben. Guar. Corp. v. Haberbush, 2000 U.S. Dist.
LEXIS 22818 at *16-17 (C.D. Cal. Nov. 3, 2000); Pension Ben.
Guar. Corp. v. FEL Corp., 798 F. Supp. 239, 241 (D.N.J. 1992).

district court under § 1342(c), seeking a decree adjudicating the plan terminated.  Id.

The employer and plan administrator agreed in their answer that termination was necessary.  Id.  The district court entered a decree adjudicating the plan terminated and selected the termination date of the date of the court's final judgment. Id. at 299.

The issue on appeal was whether the termination date could, as a matter of law, only be the date of the district court's final judgment.  Before discussing that issue, however, the Third Circuit briefly addressed the district court's decision that the plan should be terminated.  Id. at 300.  In doing so, the Court made no reference to the "arbitrary and capricious" standard and did not discuss deference to PBGC.  Id. Instead, the Court found that "[t]he district court properly terminated the pension plan since at the time of its June 28, 1979 order the plan was insolvent."  Id.  The Court noted that the district court reviewed evidence submitted by both PBGC and the union defendants.  Id.  It concluded that termination was proper because "[b]enefits payable under the plan exceed[ed] benefits guaranteed by PBGC."  Id.  This suggests that the district court came to its own conclusion that the plan should be terminated, and the Third Circuit agreed with the district court's conclusion.

In beginning its analysis of the termination date issue, the Court noted that "the statutory standard in section 1342(c) is that termination should be adjudicated 'in order to protect the interests of the participants and to avoid any further deterioration of the financial condition of the plan or any further increase in the liability of the fund.'"  Id. (quoting 29 U.S.C. § 1342(c)).  The presiding court, therefore, has to balance the interests of the plan participants with the interests of PBGC in minimizing its potential losses.  Id.

PBGC argued that the court should defer to its administrative expertise in choosing a termination date.  Id.  The Third Circuit refused to do so, since the statute "relegates resolution of disputes over termination to the court in the first instance, not to PBGC."  Id. at 301(emphasis added).  "Congress determined that in the absence of agreement between PBGC and a plan administrator the court would protect participants from overly cautious use of the involuntary termination feature of the insurance scheme."  Id.  The Court went on to establish the appropriate termination date.[8]  Id.

_____

[8] PBGC argues that Heppenstall has no relevance to this case because it involved only the establishment of a termination date.  PBGC also argues that the Third Circuit's later decision in United Steelworkers of America, et al. v. Harris & Sons Steel Co., 706 F.2d 1289 (3d Cir. 1983) supersedes Heppenstall and gives greater deference to PBGC.  However, Harris & Sons did not overrule Heppenstall.  The Court gave greater deference to the PBGC's suggested termination date because the PBGC was not

20

In another case, the Third Circuit mentioned in dicta that "PBGC may be granted a decree adjudicating termination of the plan <u>if the court finds</u> such termination necessary to protect the interests of the participants in their vested benefits and the interest of PBGC in avoiding increased liability." <u>In re Syntex Fabrics, Inc. Pen. Plan</u>, 698 F.2d 199, 201 (3d Cir. 1983)(emphasis added)(action involving a dispute over the termination date in which there was no opposition to termination of the plan).

Although the Third Circuit has not addressed the standard of review issue for an involuntary termination, these cases suggest that the Court would not have reviewed PBGC's determination that a plan should be terminated under the "arbitrary and capricious" standard. Rather, the language in the above two cases supports this Court's conclusion that, absent an agreement between PBGC and the plan administrator, a district court should come to its own determination that a pension plan should be terminated. The Court's independent decision is necessary to "protect participants from overly cautious use of the involuntary termination feature of the insurance scheme." <u>Heppenstall</u>, 633 F.2d at 301.

---

attempting to limit its liability, as it was in <u>Heppenstall</u>. Here, PBGC is trying to limit its liability by terminating a plan preemptively before risk to PBGC increases unreasonably. Thus, <u>Heppenstall</u> is relevant to the case at hand.

IV.  Conclusion

The Court concludes that the APA's "arbitrary and capricious" standard does not apply to the circumstances of this case.  The language in the statute indicates that Congress meant for the district court to make its own determination as to whether the "plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund."  28 U.S.C. § 1342(c).  The Court will make that determination de novo, and will consider evidence outside the administrative record.

An appropriate Order shall issue separately.